# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| JASON MCKENZIE,<br><br>           Plaintiff,<br><br>      v.<br><br>BDO USA, P.C., KELLY JOHNSON, WAYNE BERSON, TONY ARGIZ, MIKE CAMPBELL, MARK ELLENBOGEN, MARIA KARALIS, NATALIE KOTLYAR, HOON LEE, MONIKA LOVING, JOHN MARQUARDT, TIFFANY PRUDHOMME, and STEVEN SHILL,<br><br>           Defendants. | C.A. No. 2025-0264-LWW |

## MEMORANDUM OPINION

Date Submitted: October 21, 2025
Date Decided: January 26, 2026

Joseph L. Christensen & Anne M. Steadman, CHRISTENSEN LAW LLC, Wilmington, Delaware; *Attorneys for Plaintiff Jason McKenzie*

Aaron P. Sayers & Kevin M. Regan, MCDERMOTT WILL & EMERY LLP, Wilmington, Delaware; Michael J. Sheehan, MCDERMOTT WILL & EMERY LLP, Chicago, Illinois; *Attorneys for Defendants BDO USA, P.C., Kelly Johnson, Wayne Berson, Tony Argiz, Mike Campbell, Mark Ellenbogen, Maria Karalis, Natalie Kotlyar, Hoon Lee, Monika Loving, John Marquardt, Tiffany Prudhomme, & Steven Shill*

**WILL, Vice Chancellor**

The plaintiff is a former partner of BDO USA, P.C. After announcing his resignation, BDO and its directors reclassified his equity interest from variable to fixed shares, reducing his payout. He has sued them for breaches of contract, the implied covenant of good faith and fair dealing, and fiduciary duty.

None of his claims have merit. The operative partnership agreement authorizes BDO's board to reclassify partners at any time and in its sole discretion. Its unambiguous text defeats the contract and implied covenant claims. The fiduciary claim fails because it is bootstrapped from a contract dispute and inconsistent with the partnership agreement. This lawsuit is dismissed.

## I.      BACKGROUND

Unless otherwise noted, the following facts are drawn from the Verified Complaint and documents it incorporates by reference.[1]

### A.      The Partnership Agreement

Plaintiff Jason McKenzie began his accounting career in 2004 and eventually became a partner at an accounting firm.[2] In November 2016, that firm was acquired by defendant BDO USA, LLP, at which point McKenzie became a BDO partner.[3]

---

[1] Verified Compl. (Dkt. 1) ("Compl."); *see Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").

[2] Compl. ¶ 20.

[3] *Id.* ¶¶ 1, 20. BDO USA, LLP was originally a Delaware limited liability partnership that converted to a Delaware professional association called BDO USA P.A. in June 2023. It

2

Upon joining BDO, McKenzie signed an Amended and Restated Partnership Agreement (the "Partnership Agreement") that was governed by Delaware law.[4] The Partnership Agreement charged a board of directors with managing BDO.[5] That Board had broad discretion to designate partners among two tiers: equity partners or Variable Share Partners ("VSPs"), and non-equity partners or Fixed Share Partners ("FSPs").[6] It could designate a partner as a VSP or an FSP upon their admission to the partnership and "at any time thereafter."[7]

McKenzie was designated as a VSP upon admission.[8] As an equity partner, his compensation was determined by the number of VSP units he held.[9]

A partner's position as a VSP or FSP was not static. The Partnership Agreement allowed the Board to convert partners from their initial designations, such as from a VSP to an FSP or vice versa.[10] The Board had the "sole discretion"

---

converted once more to a Virginia professional corporation, BDO USA, P.C., in August 2023. *Id.* ¶¶ 4, 7, 31. Unless the context requires specificity, all iterations of this entity are referred to as "BDO."

[4] Compl. Ex. A ("Partnership Agreement").

[5] Compl. ¶ 7.

[6] *Id.* ¶ 21; Partnership Agreement § 5.1; *id.* § 2.1(a)-(b).

[7] Partnership Agreement § 2.1(a)-(b).

[8] Compl. ¶ 21.

[9] *Id.* ¶ 22.

[10] Partnership Agreement § 2.1(a)-(b); *see also id.* § 6.5 (noting that a VSP could be converted to an FSP "within five years preceding retirement pursuant to Article VII"); *id.* § 7.5(a) (noting again the possibility of converting a VSP to an FSP).

to determine the total number of units allocated among the partners, in such type and amounts as it saw fit.[11]

The Partnership Agreement also set procedures for the withdrawal of partners. Partners could withdraw from the partnership at any time, provided they gave six months advance notice in writing.[12] Under Article 12 of the Partnership Agreement, a withdrawing partner was entitled to receive an allocable share of BDO's profits (net of any losses) for the last fiscal year in which the partner was associated with the partnership.[13] Section 12.2 provides formulas to calculate a partner's allocable share.[14] The formula for that one-year period differs based on the "type of units allocated to such [p]artner"—that is, whether they are a VSP or an FSP.[15]

## B.    McKenzie's Departure from BDO

After raising concerns about certain business practices at BDO that went unaddressed, McKenzie decided to leave the firm.[16]

In March 2023, McKenzie told Mat Demong, BDO's East Region Managing Partner, of his intent to resign at the end of the upcoming fiscal year in April 2024.[17]

---

[11] *Id.* § 4.1.

[12] *Id.* § 11.2.

[13] *Id.* §§ 12.1(a), 12.2

[14] *Id.* § 12.2.

[15] *Id.*

[16] Compl. ¶ 23.

[17] *Id.*

Demong asked McKenzie to notify CEO Wayne Berson so that Berson could aid Demong in recruiting new partners.[18]

McKenzie found this to be an "odd request" because Demong was already actively recruiting.[19] McKenzie nonetheless emailed Berson, confirming his plan to leave and outlining the reasons why.[20]

## C. The Disputed Conversion

Three weeks after McKenzie announced his intent to resign, BDO's Board stripped him of his VSP units, converting them into non-equity FSP units.[21] The Board maintained that McKenzie's email to Berson constituted a formal notice of withdrawal under the Partnership Agreement, which purportedly authorized the conversion.[22] The effect was the reallocation of McKenzie's equity units among the remaining VSPs, including the Board members.[23]

On April 25, 2023, McKenzie objected to Matthew Becker, BDO's National Managing Partner, arguing that the conversion was unfair. McKenzie explained that the conversion would deprive him of substantial value in the event of a liquidity

---

[18] *Id.* ¶ 24.

[19] *Id.*

[20] *Id.* ¶¶ 25-26.

[21] *Id.* ¶ 28.

[22] *Id.* ¶ 28.

[23] *Id.* ¶¶ 28, 34.

5

transaction.[24]  Becker allegedly reassured McKenzie he would be "shocked" if such a transaction occurred.[25]

The next day, BDO announced its conversion from a partnership into a Delaware professional association.[26]  On April 27, the Board sent McKenzie a revised "unit allocation memo" memorializing the conversion of his 631 VSP units into 669 FSP units.[27]

### D.    This Litigation

On March 10, 2025, McKenzie filed this action, advancing three counts against BDO and the members of its Board.  Count I alleges that the individual defendants breached their fiduciary duties to McKenzie by stripping him of his VSP units to enrich themselves.[28]  Count II asserts that the defendants breached the Partnership Agreement by enacting the conversion of his units.[29]  And Count III is an alternative claim for breach of the implied covenant of good faith and fair dealing.[30]

---

[24] *Id.* ¶ 29.

[25] *Id.*

[26] *Id.* ¶ 31; *see supra* note 3.

[27] Compl. ¶ 32.

[28] *Id.* ¶¶ 37-39.

[29] *Id.* ¶¶ 40-42.

[30] *Id.* ¶¶ 43-46.

6

On May 13, the defendants moved to dismiss the Complaint.[31] Briefing was completed on June 27.[32] I heard oral argument on October 21, 2025, and took the motion under advisement.[33]

## II. LEGAL ANALYSIS

The defendants seek dismissal of the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[34] "The standards governing a motion to dismiss for failure to state a claim are well settled."[35] The court must accept:

> all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[36]

"[A] claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claims as a matter of law."[37]

---

[31] Defs.' Opening Br. in Supp. of Mot. to Dismiss (Dkt. 5) ("Defs.' Opening Br.").

[32] Br. in Opp'n to Defs.' Mot. to Dismiss Verified Compl. (Dkt. 7) ("Pl.'s Answering Br."); Defs.' Reply Br. in Supp. of Mot. to Dismiss (Dkt. 10) ("Defs.' Reply Br.").

[33] Dkt. 12.

[34] Defs.' Opening Br. 2.

[35] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

[36] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[37] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

The court need not, however, accept "conclusory allegations unsupported by specific facts or [] draw unreasonable inferences in favor of the non-moving party."[38]

The Complaint cannot withstand scrutiny, even under this deferential standard. McKenzie fails to state a viable claim for breach of an express or implied contract term. His fiduciary duty claim is likewise foreclosed because he was owed no individual duty and the theory is duplicative of his contract claim. Dismissal of each claim results.

### A.    Breach of the Partnership Agreement

To state a claim for breach of contract, McKenzie must allege: (1) the existence of a contract; (2) the breach of an obligation imposed by that contract; and (3) resulting damages. The Partnership Agreement is a valid contract, and its enforceability is not in dispute. The central issue is whether McKenzie has adequately pleaded the breach of a specific obligation imposed by that contract.

The Partnership Agreement is subject to Delaware law's "well-established principles of contract interpretation."[39] Absent ambiguity, I must interpret its terms according to their plain and ordinary meaning.[40] Those terms are inconsistent with McKenzie's theory.

---

[38] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011).

[39] *Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1043 (Del. 2023).

[40] *Id.* at 1044.

McKenzie claims that the Board breached Article 12 of the Partnership Agreement by converting his VSP units to FSP units upon receiving his notice of intent to retire. He contends that this conversion deprived him of specific payment mechanics owed to departing VSPs.[41] The defendants counter that the conversion was a valid exercise of the Board's express right to redesignate a partner's status "at any time" under Sections 2.1(b) and 4.1 of the Partnership Agreement.[42]

McKenzie fails to identify a specific contractual obligation that was breached. His claim centers on Section 12.2(b), which governs the calculation of a partner's allocable share upon termination:

> [I]f termination of a Partner occurs for any reason other than death or permanent disability pursuant to Articles IX and VIII, respectively, then such Partner's allocable share, ***based on the type of units allocated to such Partner***, shall be such Partner's allocable share of the profits or losses of the Partnership ***for the period ("short period") from the end of the last fiscal year of the Partnership until the date of termination***.[43]

This provision calculates a partner's share for their last fiscal year based on the "type of units allocated to such [p]artner."[44] It provides a formula to calculate a partner's allocable share for the *last fiscal year* they are with the partnership.

---

[41] Compl. ¶ 35; Pl.'s Answering Br. 8.

[42] Defs.' Opening Br. 10-11; *see also* Tr. of Oct. 21, 2025 Oral Arg. on Defs.' Mot. to Dismiss (Dkt. 13) ("Hr'g Tr.") 6-7.

[43] Partnership Agreement § 12.2(b) (emphasis added).

[44] *Id.*

McKenzie resigned in March 2023, effective April 30, 2024.[45] The Board converted him to an FSP effective April 2023, before his final fiscal year began.[46] For the relevant brief period under Article 12, McKenzie held FSP units and was paid accordingly. The Partnership Agreement lacks language locking in a partner's status upon resignation or prohibiting a status change before the final fiscal year.

According to McKenzie, if the Board could de-equitize a partner upon notice of retirement, the detailed payout mechanics for VSPs in Article 12 would be rendered surplusage.[47] But Article 12 retains independent meaning. It governs payouts for partners who die, become permanently disabled, or who the Board chooses not to convert before resignation.[48]

Further, the Board had the unambiguous authority to convert McKenzie from a VSP to an FSP. Section 2.1(b) of the Partnership Agreement charges the Board with the "designation of each Partner as a[n FSP] or [a VSP]" not only upon admission but also "at any time thereafter."[49] This broad grant of authority is

---

[45] Compl. ¶ 23.

[46] *Id.* ¶¶ 6, 26, 28-29.

[47] Pl.'s Answering Br. 9; *see also Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 365 (Del. 2013) (rejecting a contract interpretation that would prevent a provision from having "any independent meaning or serv[ing] any independent purpose").

[48] *E.g.*, Partnership Agreement § 12.2(b) (applying formula "if termination of a Partner occurs for any reason other than death or permanent disability").

[49] *Id.* § 2.1(b).

bolstered by Section 4.1, which provides that the Board "shall" allocate variable and fixed units "in such type and amounts *as it determines in its sole discretion.*"[50]

McKenzie's counterarguments are unavailing.[51]  Although he contends that Article 12 limits the Board's general authority in Section 2.1(b), Article 12 governs only the mechanics of a payout based on status at termination.[52]  Article 12 does not restrict the Board's authority to determine that status beforehand.[53]

Finally, the Board's conversion power is consistent with the Partnership Agreement's references to converting VSPs to FSPs.[54]  Reading Article 12 to implicitly freeze a partner's status upon resignation would contradict the "at any time" and "sole discretion" language in Sections 2.1(b) and 4.1.  I reject an interpretation that reads Article 12 in isolation rather than construing the contract "as a whole."[55]

---

[50] *Id.* § 4.1 (emphasis added).

[51] Pl.'s Answering Br. 12.

[52] *See* Partnership Agreement § 12.2; *see also* Pl.'s Answering Br. 12; Compl. ¶ 35; Defs.' Opening Br. 9-10.

[53] McKenzie's counsel conceded as much at oral argument.  Hr'g Tr. 20 ("Well, I think what you're asking is at the time they converted him was there a specific provision that was breached. . . . And I think at that point we would rely on the implied covenant . . . .").

[54] *See supra* note 10.

[55] *See In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) ("Courts interpreting a contract . . . 'constru[e] the agreement as a whole and giv[e] effect to all its provisions.'" (citation omitted)).

11

McKenzie's claim of an express breach is therefore not reasonably conceivable. The motion to dismiss Count II is granted.

## B. Breach of the Implied Covenant

McKenzie claims in the alternative that even if the Partnership Agreement did not expressly prohibit the Board's actions, the conversion breached the implied covenant of good faith and fair dealing. He asserts that the Board acted arbitrarily and unreasonably by de-equitizing him immediately after he gave notice of his intent to resign, frustrating the payout mechanics for VSPs in Article 12 of the Partnership Agreement.[56]

The implied covenant "attaches to every contract" covered by Delaware law.[57] It functions as a limited "gap-filler" to enforce the parties' reasonable expectations where the contract is silent.[58] The implied covenant can serve a gap-filling function where a contract grants discretion to one party.[59] But "if the scope of discretion is specified, there is no gap in the contract as to the scope of the discretion, and there

---

[56] Pl.'s Answering Br. 15-18.

[57] *See Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 441 (Del. 2005).

[58] *Nemec v. Shrader*, 991 A.2d 1120, 1125-26 (Del. 2010).

[59] *See Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021) ("The implied covenant imposes a good faith and fair dealing obligation when a contract confers discretion on a party.").

is no reason for the Court to look to the implied covenant to determine how discretion should be exercised."[60]

The Partnership Agreement expressly addresses the Board's authority to reclassify partners. Section 2.1(b) empowers the Board to designate a partner's status "at any time thereafter."[61] Section 4.1 further grants the Board "sole discretion" to allocate variable and fixed units.[62] These provisions comprehensively define the scope of the Board's authority, specifying who may act (the Board), what it may do (designate status), and when it may do it (at any time).[63]

The Delaware Supreme Court's decision in *Nemec v. Shrader* is instructive.[64] In *Nemec*, a company exercised a contractual right to redeem retired officers' shares "at any time" just before a lucrative merger, which denied the retirees the deal price.[65] The court rejected the retirees' implied covenant claim, holding that the company did not act arbitrarily or unreasonably by enforcing a negotiated contract

---

[60] *Miller v. HCP & Co.*, 2018 WL 656378, *11 (Del. Ch. Feb. 1, 2018) (citation omitted), *aff'd sub nom.*, *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018) (TABLE); *see also Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008) (explaining that the covenant "cannot be invoked where the contract itself expressly covers the subject at issue").

[61] Partnership Agreement § 2.1(b).

[62] *See id.* § 4.1.

[63] *See supra* notes 49-50 and accompanying text; Defs.' Opening Br. 11-12; Defs.' Reply Br. 12-13.

[64] *Nemec*, 991 A.2d at 1120.

[65] *Id.* at 1122-25.

right to its advantage.[66] It explained that the implied covenant "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not."[67]

Similarly, McKenzie accepted the risk that his VSP status could be revoked "at any time" and in the Board's "sole discretion."[68] The risk that the Board might exercise this right strategically—such as before a resignation or liquidity event—was a foreseeable consequence of the Board's rights.[69] By exercising the discretion provided for in the Partnership Agreement, the Board comported with the parties' reasonable expectations embodied in the contract's text.[70]

McKenzie insists that the Board acted in bad faith to retaliate against him and hide a liquidity event.[71] But under *Nemec*, "[a] party does not act in bad faith by relying on contract provisions for which that party bargained where doing so simply

---

[66] *Id.* at 1126.

[67] *Id.* at 1128.

[68] Partnership Agreement §§ 2.1(b), 4.1.

[69] *See Johnson & Johnson v. Fortis Advisors LLC*, — A.3d —, 2026 WL 89452, at *17 (Del. Jan. 12, 2026) ("If a development could have been anticipated, even if it was unlikely to occur, the implied covenant cannot be invoked to provide protections that 'easily could have been drafted' at the bargaining table." (citation omitted)).

[70] *See Nemec*, 991 A.2d at 1127 (holding that the company did not breach the implied covenant by exercising its right to redeem shares "at a time that was most advantageous" to the plaintiffs).

[71] *See* Compl. ¶¶ 25, 27, 29-30; *see also* Pl.'s Answering Br. 15.

limits advantages to another party."[72]  The Board utilized its authority to reclassify McKenzie's status as a partner "at any time."[73]  Because this conduct was authorized by the plain terms of the Partnership Agreement, McKenzie's allegation of a retaliatory motive cannot support a claim for breach of the implied covenant.

Accordingly, the motion to dismiss Count III is granted.

### C.     Breach of Fiduciary Duty

McKenzie's final claim alleges that the individual defendants breached their fiduciary duties by converting his VSP units to FSP units in bad faith and for their own enrichment.[74]  The defendants respond that no fiduciary duties were owed to McKenzie individually and that the claim is impermissibly duplicative of the contract claims.[75]  The defendants are correct on both points.

First, the Board owed no cognizable fiduciary duty to McKenzie as an individual partner.  Under the Delaware Revised Uniform Partnership Act (DRUPA), fiduciary duties are owed "to the partnership and the other partners" collectively.[76]

---

[72] *Nemec*, 991 A.2d at 1128.

[73] Partnership Agreement § 2.1(b).

[74] Pl.'s Answering Br. 19-20.

[75] Defs.' Opening Br. 3-8; Defs.' Reply Br. 5-10.

[76] 6 *Del. C.* § 15-404(b); *see also id.* § 404(a), (c).

15

The Complaint, however, seeks redress only for McKenzie's alleged personal mistreatment.[77]

McKenzie analogizes to corporate law, asserting that the Board owed him duties like those corporate directors owe stockholders.[78] This comparison is misplaced. At all relevant times, BDO was a partnership governed by a Partnership Agreement, not a corporation. The parties chose to organize under DRUPA, and corporate law analogies cannot be used to override the contractual and statutory framework they selected.[79]

Even if the corporate law analogy were apt, it would defeat McKenzie's argument. Corporate directors owe duties to the entity and its stockholders as a whole, not to individuals.[80] Thus, McKenzie's claim for breach of the duty of

---

[77] Compl. ¶¶ 37-46.

[78] Pl.'s Answering Br. 25-26.

[79] *Id.* at 25; *cf. Gotham P'rs, L.P. v. Hallwood Realty P'rs*, L.P., 817 A.2d 160, 171 (Del. 2002) (affirming that a partnership agreement left "no room for the application of common law fiduciary duty principles" where the parties created a specific contractual framework to govern their relationship (citation omitted)); *Norton*, 67 A.3d at 362 (explaining that a contractual grant of discretion to the general partner displaced "common law fiduciary duties" that might otherwise apply).

[80] *See, e.g., Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) ("[C]orporate directors do not owe fiduciary duties to individual stockholders; they owe fiduciary duties to the entity and to the stockholders as a whole."); *Gilbert v. El Paso Corp.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders . . . .").

16

loyalty—whether framed as a bad faith or as a self-dealing claim—fails because he has not identified a duty that was breached.

Second, the fiduciary duty claim must be dismissed as duplicative of the contract claim. Delaware law does not permit a plaintiff to "bootstrap" a contract claim into a fiduciary duty claim by alleging that the contractual breach was disloyal.[81] "[W]here a dispute arises from obligations that are expressly addressed by contract," the contract claim is typically the only one that can proceed.[82]

A fiduciary duty claim may survive parallel to a contract claim only if it depends on "additional facts," is "broader in scope," and involves "different considerations in terms of a potential remedy."[83] No such independent basis is present here. McKenzie's bad faith theory—that the Board converted him to eliminate the Article 12 payout—is inextricably tied to the terms of the Partnership Agreement. There is no meaningful distinction between the fiduciary duty claim and the contract claim, and both seek the same remedy: damages for loss of the VSP unit value.[84]

---

[81] *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) ("Courts will dismiss the breach of fiduciary claim where the two claims overlap completely and arise from the same underlying conduct or nucleus of operative facts.").

[82] *Nemec*, 991 A.2d at 1129.

[83] *Bäcker v. Palisades Growth Cap. II, L.P.*, 246 A.3d 81, 109 (Del. 2021) (quoting *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008)).

[84] Compl. ¶¶ 39, 42.

To the extent the fiduciary duty claim relies on a self-dealing theory, it is similarly foreclosed. A claim for self-dealing requires a plaintiff to plead that the fiduciaries received a material, non-ratable benefit.[85] The alleged benefit here—reallocation of McKenzie's 631 VSP units—does not meet these criteria. There is no allegation that the redistribution of these units was material to the individual defendants.[86] Even assuming there were only a few hundred equity holders among BDO's 800 partners, the pro rata redistribution of 631 units would result in a de minimis accretion to any one individual.[87] And because the units were to be redistributed among *all* VSPs, not just the defendants, the benefit was ratable.[88]

The breach of fiduciary duty claim thus fails because it involves a non-existent duty and is duplicative of the contract claims. Count I is dismissed.

---

[85] *See Maffei v. Palkon*, 339 A.3d 705, 744 (Del. 2025) ("Declining to second-guess directors' decisions to redomesticate where there are no well-pled allegations of a material, non-ratable benefit flowing to the directors or controllers furthers this important policy.").

[86] Compl. ¶ 32.

[87] *Id.* ¶ 2.

[88] *Cf. Maffei*, 339 A.3d at 731 (noting that "a director is considered interested 'when he or she will receive a personal financial benefit from a transaction that is *not equally shared* by the stockholders'" (emphasis added) (citation omitted)). To the extent McKenzie argues that the benefit was non-ratable because he was excluded, it circles back to the contract dispute over his conversion. Among the class of VSPs, of which the individual defendants were members, the benefit was shared equally. *Cf. id.* (stating that in the director context, a non-ratable benefit constitutes a "personal financial benefit" (citation omitted)).

## III. CONCLUSION

For the reasons explained above, Counts I through III of the Complaint are deficient. The Complaint fails to state any claim on which relief can be granted. The defendants' motion to dismiss is granted, and this case is dismissed with prejudice under Rule 12(b)(6).